ORIGINAL

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

FILED
FEB 21 2006
U.S. COURT OF
FEDERAL CLAIMS

EVERGREEN TRADING, LLC, by and through GLEN NUSSDORF AND CLAUDINE STRUM on behalf of GN INVESTMENTS, LLC, A Partner Other than the Tax Matters Partner,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA, by and Through its agent, the INTERNAL REVENUE SERVICE,

Defendant.

DOCKET NO: 06-123 T

---

**COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE SECTION 6226**

---

**Nature of Action**

1. This is a federal income tax partnership proceeding brought under Appendix F of the Rules of the United States Court of Federal Claims and Section 6226(a) of the Internal Revenue Code of 1986 (as amended) (26 U.S.C.: "Code §") to contest the Internal Revenue Service findings in the Notice of Final Partnership Administrative Adjustment dated September 26, 2005 ("FPAA").[1]

**Statement of the Claim**

2. Evergreen Trading, LLC through one of is notice partners, GN Investments, LLC (a flow-through entity owned by Glen Nussdorf), hereby seeks (i) a refund (with interest provided by law) of the $14,718,949 in federal income taxes illegally collected by the Internal

[1] On the same day, the IRS issued Notices of Deficiency to Mr. Nussdorf and the other asserting the same partnership adjustments at the individual level. Mr. Nussdorf, like the other indirect partners, filed a Petition with the U.S. Tax Court contesting the Defendants indirect partners' subject matter jurisdiction of the Defendant asserting adjustments to partnership items or affected items through a individual partner level deficiency proceeding prior to the resolution of this partnership level proceeding.

Revenue Service ("IRS"), (ii) a determination of the substantive partnership items set forth in the FPAA, and (iii) a determination of the reasonable cause that defeats the penalties asserted in the FPAA. That FPAA was issued by the Internal Revenue Service office located at 30 East 7th Street, St. Paul, Minnesota 55101. The adjustments relate to the years 1999 and 2000. The IRS issued the FPAA to GN Investments, LLC, whose address is 14 East 81st Street, New York, New York 10028. It is attached hereto as Exhibit A and incorporated herein by reference.

3. The FPAA excessively, unreasonably, seeks to disallow and/or disregard the following items in a manner that is excessive, erroneous, unreasonable, arbitrary, and capricious:

a. Disallows partnership losses in the amount of $38,829,037 in 1999;

b. Disregards capital contributions of $2,900,439 in 1999 and $2,500 in 2000;

c. Disallows deductions in the amount of $291,910 in 1999 and $683,301 in 2000;

d. Disregards a distribution of money in the amount of $159,300 in 2000;

e. Disregards a distribution of property other than money in the amount of $556,314 in 2000; and

f. Disregards $79,299,513 of basis in partnership interests.

4. In addition, the FPAA asserts nine contentions with respect to these adjustments and asserts alternative forms of penalties under Code § 6662. All of those assertions are disputed.

**The Parties**

5. Evergreen Trading, LLC ("Evergreen Trading") is a limited liability company formed under the laws of the State of Delaware. It is treated as a partnership for federal income tax purposes. The taxpayer identification number of Evergreen Trading is 13-4087394, and its principal place of business is 68 Carman Avenue, Cedarhurst, New York 11516. Its United

States Partnership Return (Form 1065) for 1999 and 2000 was filed with the Internal Revenue Service Center in Holtsville, NY.

6. GN Investments, LLC ("GN Investments") is a member and a notice partner of Evergreen Trading.

7. GN Investments has an interest in the outcome of this action because the partnership items of GN Investments have not become non-partnership items by reason of one or more of the events described in Code § 6231(c) and the period of limitations for assessment of partnership items against GN Investments has not expired.

8. The tax matters partner is Sentinel Advisors, LLC. Its current address is 68 Carman Avenue, Cedarhurst, New York 11516.

9. Such tax matters partner has not filed a complaint for readjustment of partnership items within the period specified in Code § 6226(a).

10. Glenn Nussdorf is an individual who is the sole member of GN Investments. Glen is an indirect partner of Evergreen Trading pursuant to Code § 6231(a)(10). His address is 14 East 81st Street, New York, NY 10028. Claudine Strum is married to and filed a joint return with Glen in 1999 and 2000 and also is treated as an indirect partner of Evergreen Trading, pursuant to Code § 6231(a)(2).

11. The Defendant is the United States of America with respect to the claims and actions by its agent, the IRS, an executive agency within the Department of Treasury. Service of process may be made on Defendant through the Attorney General at the Tax Division of the Department of Justice and upon such other offices or individuals as may be required.

**Jurisdiction**

12. This Court has jurisdiction over this claim, pursuant to 28 U.S.C. § 1508 and 26 U.S.C. § 6226(b).

**Deposit**

13. On February 17, 2006, Mr. Nussdorf deposited $14,718.949 with the IRS at Hauppauge, New York. In accordance with Code § 6226(e), the deposit represents the amount by which GN Investments' tax liability would be increased "if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by" the FPAA issued by the Internal Revenue Service.

**Assignments of Error**

14. The FPAA issued by the IRS erred in the following particulars:

a. In attempting to do indirectly what the IRS admits it cannot do directly;[2]

b. In seeking to substitute pejoratives and self-serving labels for the results permitted by law, simply because those results and that law do not favor the IRS in this particular case;

c. In consistently seeking to circumvent the rule of law properly enacted by Congress -- including, *inter alia*, Sections 701, 704, 722, 732, 752, 761, 1012, 6221, 6226, 6664, 7701, and various elements of the U.S. Constitution;

d. In asserting a blunder bust of result-driven alternative assertions and thereby, tacitly admitting that no one assertion is effective;

[2] The heart of the IRS objection is that neither GN Investments nor Evergreen Trading reduced the partnership basis by the amount of a potential obligation to deliver Euros in the future under a call option held by an unrelated third party. As recently as June 23, 2004, the IRS admitted that the Tax Court correctly held in *Helmer v. Commissioner*, T.C. Memo 1975-160 that such an option results in NO BASIS REDUCTION. Cf., Temp. Reg. § 1.752-6T (IRS attempt to retroactively reverse *Helmer*). In short, the returns filed by Evergreen Trading and by Glen Nussdorf and Claudia Strum treated that basis correctly.

e. In asserting Evergreen Trading was somehow a sham despite its extensive trading activity and numerous non-tax purposes;

f. In asserting the run that Evergreen Trading was formed or availed of solely for purposes of tax avoidance, had no business purpose other than tax avoidance, and that the formation of Evergreen Trading, the acquisition of any interest in the partnership by the partner, the purchase of offsetting options, the transfer of offsetting options to a partnership in return for a partnership interest, the purchase of assets by the partnership, and the distribution of those assets to the partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate a loss, according to Defendant, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes, and, as a consequence, the partnership and the transactions described above shall be disregarded in full and any purported losses resulting from these transactions are not allowable as deductions for federal income tax purposes.

g. In asserting that, under Treas. Reg. § 1.701-2, Evergreen Trading was a sham, lacked economic substance, and was formed in connection with a transaction or transactions, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code, and, as a consequence, (i) the partnership

should be disregarded and all transactions engaged in by the partnership should be treated as engaged in directly by the partners including the determination that the assets acquired by Evergreen Trading, including but not limited to foreign currency options, were acquired directly by the partners; (ii) the foreign currency options contributed to or assumed by Evergreen Trading are treated as never having been contributed to or assumed by Evergreen Trading, and any gains or losses realized by Evergreen Trading on the options are treated as having been realized by its partners; (iii) the partners of Evergreen Trading should be treated as not being partners of Evergreen Trading; and (iv) contributions to Evergreen Trading will be adjusted to reflect clearly the partnership's or partner's income;

h. In violating the U.S. Constitution in at least three different ways by adopting and asserting here the most criticized regulation in the last 30 years, Treas. Reg. § 1.701-2;

i. In failing to apply the principles embedded in Examples 1, 9, and 10 of that regulation;

j. In further violating the U.S. Constitution as well as the Administrative Procedures Act in adopting and asserting here Treas. Reg. § 1.752-6T RETROACTIVELY REACHING BACK FOUR YEARS to purportedly change the law governing Evergreen Trading and its investments;

k. In attempting to do indirectly what the law prohibits Respondent from doing directly to wit, reducing the basis in a purchased option by the amounts received from selling a different option;

l. In asserting that the contingent obligations under the foreign currency call options written by the some, but not all, members of Evergreen Trading and subsequently assumed by Evergreen Trading are liabilities within meaning of Code § 752, and as a result, are treated as distributions of money to the members that reduce their outside bases in Evergreen Trading:

   a. In attempting to retroactively reverse the partnership liability rules – more than three years after Evergreen Trading filed its United States Partnership Return;

   b. In specifically violating the Separation of Powers doctrine by reversing judicial precedent that the IRS itself successfully established in, *inter alia, Deputy v. DuPont*, 308 U.S. 488, 497 (1940) (obligation to deliver property in order to close out short sale is not an "indebtedness") and *Helmer v. Commissioner*, T.C. Memo 1975-160, 34 T.C.M. 727 (1975) (a contingent obligation to deliver an asset in the future under a sold/written option does not constitute a partnership liability);

m. In asserting that the option positions engaged in by Evergreen Trading should be considered straddle positions for purposes of Code § 1092, when each option position speculated on different currencies that moved

independently of one another and, therefore, cannot be combined as a matter of law;

n. In asserting that neither Evergreen Trading nor its partners entered into the options positions in foreign currency or stock with a profit motive for purposes of Code § 165(c)(2);

o. In asserting that, even if the (purchased) currency options were treated as contributed to Evergreen Trading, the amount treated as contributed by the partners under Section 722 is reduced by the amounts received by the contributing partners from the sale of call options to the same counterparty, and as a consequence, the basis of the contributed options is reduced, both in the hands of the contributing partners and Evergreen Trading and any corresponding increases in the outside basis in Evergreen Trading resulting from the contributions of the foreign currency options are disallowed;

p. In asserting that, under Section 723, the adjusted bases of the long call positions, zero coupon notes, and other contributions contributed by the partners to Evergreen Trading has not been established in an amount greater than zero;

q. In further asserting that, in the case of a sale, exchange, or liquidation of Evergreen Trading partners' partnership interests, neither the partnership nor the partners have established that the bases of the partners' partnership interest were greater than zero for purposes of determining gain or loss to

such partners from the sale, exchange, or liquidation of such partnership interest.

r. In further asserting that the 40% penalty attributable to a gross valuation misstatement applies under Code §§ 6662(a), 6662(b)(1), 6662(c) and 6662(h);

s. In asserting alternatively that the 20% penalty attributable to negligence or disregard of rules and regulations applies as provided by Code §§ 6662(a), 6662(b)(2), and 6662(c);

t. In asserting alternatively that the 20% penalty attributable to a substantial understatement of income tax applies under Code §§ 6662(a), 6662(b)(2), and 6662(c) and that the 20% penalty for substantial understatement of income tax for tax shelter transactions applies; and

u. In asserting alternatively that the 20% penalty for substantial valuation misstatement applies under Code §§ 6662(a), 6662(b)(2), and 6662(c).

**Facts**

15. The facts and mixed matters of fact and law on which Plaintiffs rely are as follows:

a. Mr. Nussdorf is an experienced investor and businessman with substantial knowledge of complex financial derivatives and foreign currencies.

b. In 1999, Mr. Nussdorf was looking to hedge the exposure faced by his family's business to foreign currency fluctuations and find investments that could provide substantial returns unrelated to the movement of the U.S. stock markets.

c. With the assistance of his Chief Financial Officer, Mr. Nussdorf evaluated many investment opportunities, several of which provided both the potential for profit and the potential for tax benefits.

d. One such investment was presented by Ari Bergmann, the managing member of a hedge fund that specialized in investing in highly leveraged financial derivative instruments.

e. That hedge fund was Sentinel Advisors. Located in New York, NY, Sentinel Advisors managed upwards of $150 million in assets in a wide variety of investment vehicles.

f. Sentinel proposed a highly leveraged investment in Euros and other foreign currencies using financial derivative instruments such as options designed to profit on incremental moves of the underlying currencies against the U.S. Dollar as well as each other.

g. Mr. Nussdorf and his advisors met on a number of occasions with Mr. Bergmann to discuss the Mr. Bergmann's trading philosophy.

h. During those meetings, Mr. Bergmann presented Mr. Nussdorf and his advisors with detailed descriptions of the various derivative instruments Sentinel uses to create high risk / higher reward investment portfolios.

i. Mr. Nussdorf was impressed with the credentials of Sentinel and its members. The principals at Sentinel had extensive foreign currency trading experience with the major New York banks such as Bankers Trust and Goldman Sachs.

j. Over the next few months, Mr. Nussdorf continued discussions with the principals at Sentinel regarding their investment philosophy.

k. At the same time, Mr. Nussdorf performed due diligence regarding Sentinel Advisors, Ari Bergmann, and the Euro.

l. Consistent with Mr. Bergmann's position, that due diligence confirmed that the Euro was substantially undervalued with respect to the U.S. Dollar. That view was also consistent with the general business press which was reporting that, in light of the improving overall economic conditions in Europe, many foreign analysts and traders on Wall Street believed the Euro was primed for a positive move against the U.S. Dollar.

m. Sentinel presented a two part investment program designed around highly leveraged Euro call options that provided significant profit potential on relatively small changes in the Euro's exchange rate against the dollar. Sentinel also advised Mr. Nussdorf on using exotic options such as knock-out options and binary options to create high risk/higher reward trading positions.

n. The initial investment involved the purchase and sale of bullish Euro call options. Mr. Nussdorf was told these options could at least double his investment, a return of 100%. Sentinel advised Mr. Nussdorf that these options could provide significantly higher returns by actively trading them as the Euro appreciated against the dollar.

o. Sentinel advised Mr. Nussdorf that to actively trade these options and to engage in more sophisticated exotic options in order to reap higher returns,

it would be necessary to contribute the existing options to a hedge fund along with additional cash.

p. Based on Sentinel's representations, Mr. Nussdorf understood that Sentinel's investment program offered at least three separate sets of opportunities to make a great deal of money if Sentinel's bullish bet on the Euro was right:

a. Mr. Nussdorf could at least double their money on holding certain conventional Euro options;

b. Mr. Nussdorf could increase that rate of return by actively trading the options;

c. Mr. Nussdorf could reap substantially larger returns by trading exotic options such as knock-out options and binary options; and

d. Mr. Nussdorf could also profit from the hedge fund trading in individual foreign currencies, more vanilla foreign currency positions, and equities.

q. Based upon the favorable responses Mr. Nussdorf and those assisting him received regarding Sentinel's reputation and the general consensus of the Euro's probable rebound, Mr. Nussdorf asked Mr. Bergmann if he invested his own money in similar derivative instruments.

r. Mr. Bergmann confirmed that he had and showed Mr. Nussdorf summaries of actual trades where substantial gains were received by Mr. Bergmann and other investors.

s. In the end, Mr. Nussdorf decided to invest a small portion of his assets with Mr. Bergmann, promising substantially more investable assets were Mr. Bergmann to trade successfully.

t. Mr. Nussdorf was told that, as a practical matter, the active trading of conventional options and exotic options were best handled through a professionally managed partnership for these reasons.

u. From his previous experience in a wide variety of investment vehicles, Mr. Nussdorf knew that investment and hedge funds were normally conducted through a partnership for a host of reasons.

v. The structure of the partnership contained a number of features that made a great deal of sense to Mr. Nussdorf.

w. Mr. Nussdorf particularly liked that Sentinel itself would be a member of the LLC/partnership and would serve as the managing member, so that those who were the most knowledgeable about the trading would participate in the success.

x. For the same reason, Mr. Nussdorf liked the fact that Sentinel not only would contribute its own cash to the partnership but would be motivated by the promise of a very handsome success bonus. As the Managing Member of Evergreen Trading, Sentinel was entitled to 20% of the Net Capital Appreciation enjoyed by the fund. In Mr. Nussdorf's estimation, this "incentive allocation" provided Sentinel with the added motivation to place Evergreen Trading into profitable investments. After all, for every

dollar of profit earned by Evergreen Trading, Sentinel would take home 20 cents.

y. Mr. Nussdorf was also told that, even if the Euro dropped, the tax laws provided some downside protection.

z. Mr. Nussdorf knew from experience that many investments carried potential tax advantages.

aa. From his experience through the years as a successful businessman and investor. Mr. Nussdorf knew that he needed to rely upon capable people to handle the intricacies of the tax laws and that business transactions can and should be structured with tax consequences in mind.

bb. Consistent with the effort to maximize profits, Mr. Nussdorf negotiated reductions in various costs, including the consulting fees with New Vista, an affiliate of Sentinel.

cc. On November 18. 1999, GN Investments bought a one year, European-style Euro / U.S. Dollar ("EUR/USD") call option for a premium of $26.700,190 from AIG International ("purchased call option"). AIG International (now AIG Trading Group. Inc.) is a first tier market maker for spot trades, forwards, and options in both developed and emerging market currencies.

dd. Under the purchased call option, which had a strike price of 1.05350. GN Investments held the right to purchase EUR 520,399,400 in exchange for U.S. $548,240,767.90 on the expiration date of the option.

ee. Also on November 18. 1999, GN Investments sold a one year, European-style. EUR/USD call option for a premium of $26,433,171 to AIG International ("sold call option"). The sold call option. which had a strike price of 1.05450. provided AIG with the right to purchase EUR 520,399,400 for U.S. $548,761,167.30.

ff. Consistent with industry practice, the parties netted the payments owed to each other and GN Investments paid to AIG the net difference between the two options, or $267,019.

gg. Again, Consistent with Mr. Nussdorf's intent to actively trade these initial option positions. Mr. Nussdorf also agreed to pay AIG a trading fee equal to $148,333. This fee allowed GN Investments and Evergreen Trading to trade the options without incurring substantial bid/ask spreads for each trade. A bid/ask spread is a type of commission charged by the market maker, here AIG, to cover the substantial costs incurred in setting up option positions.

hh. The sold call option was a contingent obligation under which GN Investments would not be liable unless and until AIG exercised the option.

ii. Neither GN Investments or Evergreen Trading (to whom the option was later transferred) was ever call upon to fulfill this contingent obligation.

jj. On or about November 30. 1999. as the Euro continued to struggle against the dollar, GN Investments contributed its purchased call option and assigned its rights under the sold call option to Evergreen Trading, a limited liability company treated as a partnership for federal tax purposes.

kk. In exchange for contributing its purchased call option and $667,500 in cash, GN Investments received a 29.89% interest in Evergreen Trading.

ll. Despite the rosy predictions of the Euro's impending appreciation against the dollar, the Euro continued to depreciate against the dollar throughout the remainder of 1999 and through 2000. In light of this unexpected reversal of the Euro, Sentinel engaged in trading currencies other than the Euro, in the hopes of riding out the Euro's collapse.

mm. One of those trades was a binary options trade involving the Danish Krone, the German Mark, and the Japanese Yen. This complex trade was designed to earn significant returns based on the relationship between the three currencies.

nn. During 1999, Evergreen Trading incurred net losses and deductions of $39,120,947, of which $11,691,521 was allocated to GN Investments.

oo. The partnership continued trading well into 2000 and reported net income of $37,905,225, of which 11,448,949 was allocated to GN Investments.

pp. The partnership was bona fide. Further, each partnership transaction or series of related transactions were entered into for a substantial business purpose.

qq. Evergreen Trading was formed to permit its partners to conduct business jointly, including investment activities through a flexible economic arrangement without incurring an entity-level tax.

rr. At all relevant times, Evergreen Trading has been a legally recognized entity under Delaware law.

ss. Following its formation in 1999 and continuing into 2000, Evergreen Trading engaged in business activity in its name and on its own behalf as a limited liability company.

tt. Investing through a partnership such as Evergreen Trading certainly served the important business purposes that normally cause people to form limited liability companies and partnerships (*e.g.*, increasing returns through centralized control and investment decisions, leverage, collateral, administrative efficiency, consolidated cost reduction), but here it was also essential considering that Evergreen's trading philosophy was consistent with that of a hedge fund. As a matter of industry practice, hedge funds are organized as partnerships or limited liability companies.

uu. Contrary to the assertion in the FPAA, the tax consequences to each partner of partnership operations and of transactions between the partner and the partnership accurately reflected such partner's economic arrangement and clearly reflected such partner's income (individually and collectively) under the law.

vv. The partnership was formed for the express purpose of making money from trading. Mr. Nussdorf would not have participated but for the opportunity to make money and diversify his investment positions through currency trading. The partnership was not formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K.

ww. During 1999 and 2000, Evergreen (i) entered into enforceable binding option contracts in its own name as a party; (ii) maintained trading accounts in its own name at Salomon Smith Barney; (iii) acquired foreign currency positions in its own name; (iv) bought foreign currency positions in its own name; (v) sold foreign currency positions in its own name; (vi) acquired equities in its own name; and (vii) conducted business as a functioning, existing limited liability company.

xx. Evergreen Trading made all filings required by law. It had a separate bank account in its name. It traded and otherwise did business with unrelated parties in its name. In all respects, it conducted itself as a business entity, distinct from its partners.

yy. GN Investments' Purchased Euro Option and Sold Euro Option constituted separate and distinct, (albeit related) assets owned by unrelated arm's length third-parties. Under the contractual terms of each trade confirmation, (i) each constituted separate property in the form of contract rights under state law, (ii) each contract was separately enforceable under state law, (iii) either option could be separately restricted/replaced, logged-in, logged-out, assigned, bought, or sold without altering the other option; (iv) one contract could have been embraced and the other disavowed under debtor/creditor rights, (v) each purchased call option and sold call option was independently transferable and assignable, (vi) each purchased call option and sold call option had a different strike price, (vii) each purchased and sold call option had a different notional amount, and

(viii) either separately option could be separately exercised with exercising the other option.

zz. Evergreen Trading and its partners also utilize well qualified advisors to evaluate the financial merits of the trades and the proper tax treatment of the trading in issue.

aaa. Evergreen Trading and its partners did not attempt to limit the scope of the advisors' research or investigation. Mr. Nussdorf secured tax opinions from his respected tax advisors, who informed him that the tax treatment of the losses from and transactions with Evergreen Trading, as reported on the respective returns, were more likely than not correct.

bbb. In its temporary regulation (§ 1.752-6T) dated June 23, 2003, the IRS admitted that Evergreen and its partners were correct at the time with respect to the central point the IRS now labels as an abuse – the rule of law the IRS itself established in *Helmer v. Commissioner*, T.C. Memo 1975-160, 34 T.C.M. 727 (1975) (contingent obligations to deliver property under an option do not constitute liabilities that affect basis under Code § 752).

ccc. Evergreen Trading filed its 1999 return in good faith with due and reasonable regard for the income tax rules and regulations, and in reliance on qualified tax professionals who were in possession of all pertinent facts when the return was filed and whom Evergreen and its partners believed when the experts opined that the position taken was more likely than not the correct position. The actions undertaken by Evergreen Trading and its

partners meet and exceed the ordinary care protected by Code §§ 6662 and 6664 in complying with the income tax rules and regulations. Neither Evergreen Trading nor its partners were negligent; nor did either act with intentional disregard of the rules or regulations under Code §6662.

ddd. Neither the value nor the adjusted basis of any property claimed on Evergreen Trading's 1999 federal income tax return was 400% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in Code § 482, 400 % or more (or 25% or less) of the amount determined under Code § 482 to be the correct amount of such price. All transactions reflected on the returns were reported at amounts based on trading transactions with unrelated parties. No amounts on the returns were determined by valuation. Thus, the 40% valuation misstatement penalty is not applicable to Evergreen Trading or its partners.

eee. Neither the value nor the adjusted basis of any property claimed on Evergreen Trading's 1999 federal income tax return was 200% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in Code § 482, 200% or more (or 50% or less) of the amount determined under Code § 482 to be the correct amount of such price. Thus, the 20% valuation misstatement penalty is not applicable to Evergreen Trading or its partners.

fff. Evergreen Trading had no substantial understatement of its income tax. Moreover, Evergreen Trading and any transactions at issue are not tax shelters as defined by Code. Code § 6662(d)(2)(C) or (D). Even if a substantial understatement of income tax were ultimately determined to be due, there was substantial authority for the treatment of all items on the 1999 return of Evergreen Trading and each partner had a reasonable basis for believing that the tax treatment of such item was more likely than not the proper treatment. Furthermore, all items were disclosed on the appropriate return and there was a reasonable basis for the tax treatment of each item.

ggg. In all events, no penalty can or should be applied against Evergreen, as an entity or against its partners since all concerned proceeded in good faith based upon reasonable cause within the meaning of Code § 6664(c).

16. Defendant relied in the FPAA upon language in Treas. Reg. § 1.701-2(a) and (b) that:

a. Contradicts, *inter alia*, the accurate analysis and conclusions codified in Treas. Reg. § 1.701-2(d). Examples 1, 9, and 10;

b. Creates internal inconsistencies, ambiguities, and unconstitutional vagueness:

c. Seeks to circumvent, ignore, limit, restrict, and/or repeal various statutes enacted by Congress and thereby violates the legislative element of the Separation of Powers doctrine;

d. Seeks to unilaterally reverse precedent adopted by the judiciary and thereby violates the Separation of Powers doctrine confirmed in, *inter alia*, *Bankers Trust of New York v. United States*, 225 F.3d 1368, 1376 (Fed.Cir. 2000) (*citing Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803); and

c. Is otherwise invalid, null, and void.

17. To the extent any part of Treas. Reg. § 1.701-2 is valid or relevant, Defendant's regulation confirms by way of examples in subsection (d) that Evergreen Trading should be recognized as a valid partnership for federal tax purposes:

a. In Example 1, the parties chose a partnership format (there a limited partnership, here a limited liability company) as a means of providing one of the partners with limited liability.

b. Defendant confirms in Example 1 that Congress intended Subchapter K to "permit taxpayers [such as the members of Evergreen Trading] to conduct joint business activity through a flexible economic arrangement without incurring an entity level tax."

c. In Example 1 Treas. Reg. § 1.701-2(d), Defendant confirms that even though one partner alone "retained. indirectly, substantially all of the benefits and burdens of ownership of the property [that 99% partner contributed], the decision to organize and conduct business through [a partnership] under these circumstances is consistent with this intent [under Subchapter K]."

d. Further, Defendant confirms in Example 1 of its regulation that "on these facts [i.e., formation of a limited liability entity as a means of limiting liability for the 99% partner], the requirements of [Treas. Reg. § 1.701-2] (a)(1), (2), and (3) are satisfied."

e. Defendant's regulation then concludes in mandatory terms that "[t]he Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction."

18. Examples 9 and 10 of Defendant's Treas. Reg. § 1.701-2(d) also require recognition of Evergreen Trading, LLC.

a. In Example 9, A, one of the partners in partnership PRS decided to withdraw as did several of the members of Evergreen Trading.

b. The partnership agreement in the example permits A to receive cash or securities upon withdrawal – a determination that is retained by the managing member under the Evergreen Trading Operating Agreement.

c. As here, A's outside basis in his partnership interest ($100x in the example) is significantly greater than the partnership's inside basis ($20x) in the securities the partnership chose to distribute.

d. Defendant's Example 9 recognizes that, as here, Code Section 732(b) attributes A's basis in his partnership interest ($100x) to the securities distributed to him. As here, A may then sell those securities and recognize a substantial loss.

e. As here, the partnership (PRS) chose to make no election under Code Section 754 adjusting the partnership's basis in its remaining assets.

f. Defendant confirms in Example 9 that the tax consequences flow from the "electivity" Congress injected into Code Section 754, that the transaction is deemed to clearly reflect income, and that the Commissioner cannot

recast the transaction, even though Example 9 specifies the principal purpose of the A and PRS as follows:

> In selecting the assets to be distributed, A and P had a principal purpose to take advantage of the facts that (i) A's basis in the Securities shall be determined by reference to A's basis in its partnership interest under section 732(b), and (ii) because PRS will not make an election under Section 754, the remaining partners of PRS will likely enjoy a federal tax timing advantage (i.e., from the \$80x of additional basis in its assets that would have been eliminated in the Section 754 election had been made) that is inconsistent with proper reflection of income under paragraph (a)(3) of this section.

g. Having said that, Defendant then confirms that the tax treatment is proper there and therefore, here.

h. Defendant's Example 10 confirms that exact same conclusion that the same tax treatment flows by operation of law under Code Section 732(b) even where the principal purpose is to shift basis, that various aspects of Subchapter K (specifically including Section 732) necessarily distort income, and that:

> Thus, the application of section 732 to this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this Section to recast the transaction.

i. The positions urged by Defendant in this case also contradict the Defendant's historic construction and application of the word liability for purposes of Code Section 752 and other determinations of basis.

   a. That contradiction converts the historic clarity into inconsistencies, ambiguities, and unconstitutional vagueness.

b. Specifically, Defendant offsets the Eurodollar options the GN Investments sold, against the Eurodollar options it purchased. As a result, Defendant reduces the basis of the options in the hands of GN Investments.

c. The obligations under the sold options depended upon the future determination by the counterparty, which determination in turn depended upon, *inter alia*, future market fluctuations, etc.

d. Historically, Defendant established and publicized that every liability is an obligation but not every obligation is a liability, and that an obligation does not rise to the level of a liability unless it is fixed (i.e., not contingent upon some future event).

e. Mr. Nussdorf and his advisors specifically relied upon Defendant's historic construction to their (potential) detriment.

f. As a matter of fundamental fairness and the duty of consistency, Defendant must be estopped from converting the clear construction into an indecipherable ambiguity inviting the facile application here of "heads the Commissioner wins, tails the citizen loses."

WHEREFORE, Plaintiffs pray after due proceedings:

(i) For a redetermination of the FPAA to remove all adjustments to income, losses, distributions, basis, and penalties;

(ii) For a recovery of the $14,718,949 in taxes and penalties deposited (plus any interest permitted by law);

(iii) That Defendant bears the burden of proof as to all issues; and

(iv) That the Court grant such other and further relief as it deems appropriate.

Respectfully submitted,

David D. Aughtry
Georgia Bar No. 028010

Linda S. Paine
Tax Bar No. 15414000

COUNSEL FOR PLAINTIFFS

Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, NE, Ninth Floor
Atlanta, Georgia 30303
(404)659-1410
(404)659-1852 Facsimile

Internal Revenue Service

Department of the Treasury

30 East 7th Street
St. Paul, Minnesota 55101

Refer To:
ESB Stop 4020BK
Taxpayer Identifying Number:
11-3516229
Name of Partnership:
Evergreen Trading, LLC
Partnership Identifying Number:
13-4087394
Tax Year Ended:
December 31, 1999 & 2000
Date FPAA Mailed to Tax Matters Partner:
SEP 26 2005
Person to Contact:
Bill Kahnke
41-03606
Contact Hours:
8:00 am to 4:30 pm
Contact Telephone Number:
(651) 312-7909

Date: SEP 26 2005

GN Investments, LLC
2060 Ninth Avenue
Ronkonkoma, NY. 11779

NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.



EXHIBIT
A

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Kevin Harris

Kevin Harris BK

Technical Services Territory Manager, Midwest Area

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

**FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP**

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

**Internal Revenue Service**

30 East 7th Street
St. Paul, Minnesota 55101

Date: SEP 26 2005

GN Investments, LLC
2060 Ninth Avenue
Ronkonkoma, NY. 11779

**Department of the Treasury**

Refer To:
ESB Stop 4020BK
Taxpayer Identifying Number:
11-3516229
Name of Partnership:
Evergreen Trading, LLC
Partnership Identifying Number:
13-4087394
Tax Year Ended:
December 31, 1999 & 2000
Date FPAA Mailed to Tax Matters Partner:
SEP 26 2005
Person to Contact:
Bill Kahnke
41-03606
Contact Hours:
8:00 am to 4:30 pm
Contact Telephone Number:
(651) 312-7909

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Kevin Harris

Kevin Harris BK

Technical Services Territory Manager, Midwest Area

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

| Form 870-PT (Rev. 8-2004) | Department of the Treasury — Internal Revenue Service **Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY REFER TO: ESB Stop 4020 |
|---|---|---|

| Taxpayer(s) name(s), address and ZIP code: | Name of Partnership: Evergreen Trading, LLC<br>Taxpayer Identifying Number: 13-4087394 | Tax Year(s) Ended: December 31, 1999 December 31, 2000 |
|---|---|---|
| GN Investments, LLC<br>2060 Ninth Avenue<br>Ronkonkoma, NY 11779<br><br>Taxpayer Identifying Number: 11-3516229 | Name of Tax Matters Partner:<br>AN Investments, LLC - 12/31/1999<br>Sentinel Advisors, LLC - 12/31/2000 | |

**Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts**
**&**
**Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts**

Under sections 6224(c) and 7121 of the Internal Revenue Code (IRC) of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with IRC sections 6224(b) and 6213(d), also waive the restrictions provided by IRC sections 6225(a) and 6213(a) and consent to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax, and additional amounts that relate to partnership items, as determined in this agreement, plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under IRC section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf. If this is a partial agreement, the period of limitations for assessing any tax attributable to the settled items shall be determined as if this agreement had not been entered into.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax, and additional amounts may be filed or prosecuted.

| Signature of Taxpayer | Date Signed |
|---|---|
| Signature of Taxpayer | Date Signed |
| By (Signature and Title) | Date Signed |

| FOR INTERNAL REVENUE USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

## INSTRUCTIONS FOR SIGNING FORM 870-PT

1. If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses should sign Form 870-PT. One spouse may sign as agent for the other if acting under a power of attorney, which, if not previously filed, must accompany this form. The IRS may accept the signature of only one spouse at its discretion. However, the agreement will only be binding on the signing spouse.

2. If the taxpayer is a corporation, the waiver must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4. If this offer is signed by a trust, the agreement must be signed with the trust name, followed by the signature and title of the person authorized to sign on behalf of the trust.

5. If this offer is with respect to the tax liability for the consolidated return year, the agreement should be signed in the name of the common parent of the consolidated group for the consolidated return year. The common parent corporation signs the agreement in its own name. The signature and title of a current officer of the common parent corporation, who is authorized to bind the corporation, should be displayed in the signature block.

6. If the Tax Matters Partner signs this offer, please include the title with the signature.

7. If this offer is signed by a Tax Matters Partner that is a subsidiary corporation, then an officer authorized to sign this agreement for the year(s) indicated on the form must sign for the parent corporation. An authorized officer for the subsidiary corporation should also sign if the Tax Matters Partner is binding non-notice partners under the agreement. See Treas. Reg. 1.1502-77(a)(3)(v).

Department of the Treasury — Internal Revenue Service

# Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts

## SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP<br>Evergreen Trading, LLC<br>TAXPAYER IDENTIFYING NUMBER 13-4087394 | TAX YEAR(S) ENDED<br>12/31/1999 | <br>12/31/2000 | |
|---|---|---|---|
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | -0- | -0- | |
| OTHER ADJUSTMENTS | | | |
| A. Other Income (Loss) | | | |
| (1) ADJUSTMENT | 38,829,037 | (37,905,225) | |
| (2) AS REPORTED | (38,829,037) | 37,905,225 | |
| (3) CORRECTED | -0- | -0- | |
| B. Other Deductions | | | |
| (1) ADJUSTMENT | 291,910 | 683,301 | |
| (2) AS REPORTED | (291,910) | (683,301) | |
| (3) CORRECTED | -0- | -0- | |

REMARKS

* Reference Exhibit A attached.

Accuracy Penalties under IRC Section 6662 are included as a partnership level determination. See Exhibit A, Paragraph 10 for a description of the penalties.

## Form 870-PT, Other Adjustments (Continued)

Page ____ of ____

| NAME OF PARTNERSHIP<br>Evergreen Trading, LLC<br>TAXPAYER IDENTIFYING NUMBER 13-4087394 | TAX YEAR(S) ENDED 12/31/1999 | 12/31/2000 | |
|---|---|---|---|
| C. Capital Contributions | | | |
| (1) ADJUSTMENT | (2,900,439) | (2,500) | |
| (2) AS REPORTED | 2,900,439 | 2,500 | |
| (3) CORRECTED | -0- | -0- | |
| D. Distributions of Money | | | |
| (1) ADJUSTMENT | -0- | 159,300 | |
| (2) AS REPORTED | -0- | (159,300) | |
| (3) CORRECTED | -0- | -0- | |
| E. Distributions of Property Other than Money | | | |
| (1) ADJUSTMENT | -0- | 556,314 | |
| (2) AS REPORTED | -0- | (556,314) | |
| (3) CORRECTED | -0- | -0- | |
| F. Outside Partnership Basis | | | |
| (1) ADJUSTMENT | (79,299,513) | -0- | |
| (2) AS REPORTED | 79,299,513 | -0- | |
| (3) CORRECTED | -0- | -0- | |
| G. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| H. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| I. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |

Evergreen Trading, LLC
EXHIBIT A

1. It is determined that neither Evergreen Trading, LLC nor its purported partners have established the existence of Evergreen Trading, LLC as partnership as a matter of fact.

2. Even if Evergreen Trading, LLC existed as a partnership, the purported partnership was formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners. The formation of Evergreen Trading, LLC, the acquisition of any interest in the purported partnership by the purported partner, the purchase of offsetting options, the transfer of offsetting options to a partnership in return for a partnership interest, the purchase of assets by the partnership, and the distribution of those assets to the purported partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate at a loss, all within a period of less than six months, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, the partnership and the transactions described above shall be disregarded in full and any purported losses resulting from these transactions are not allowable as deductions are not allowed for federal income tax purposes.

3. It is determined that Evergreen Trading, LLC was a sham, lacked economic substance and, under § 1.701-2 of the Income Tax Regulations, was formed and availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that:
   a. the Evergreen Trading, LLC is disregarded and that all transactions engaged in by the purported partnership are treated as engaged in directly by its purported partners. This includes the determination that the assets purportedly acquired by Evergreen Trading, LLC, including but not limited to foreign currency options, were acquired directly by the purported partners.
   b. the foreign currency option(s), purportedly contributed to or assumed by Evergreen Trading, LLC, are treated as never having been contributed to or assumed by ~~said partnership~~ and any gains or losses purportedly realized by Evergreen Trading, LLC on the option(s) are treated as having been realized by its partners.

   c. contributions to Evergreen Trading, LLC will be adjusted to reflect clearly the partnership's or purported partners' income.

4. It is determined that the Euro short positions (written call options) transferred to Evergreen Trading, LLC constitute liabilities for purposes of Treasury Regulation §1.752-6T, the assumption of which by Evergreen Trading, LLC shall reduce the purported partners' bases in Evergreen Trading, LLC in the amounts of $26,433,171 for each of the three partners, but not below the fair market value of the purported partnership interest.

5. It is determined that trading losses of $38,837,363 claimed by Evergreen Trading, LLC are part of straddle positions as governed by § 1092 and as such are nondeductible losses in the 1999 tax year. Limitations imposed by § 1092 include the limitation that deductible trading losses incurred as part of straddle positions are limited to only those amounts in excess of unrecognized trading gains.

6. It is determined that neither Evergreen Trading, LLC nor its purported partners entered into the option(s) positions or purchase the foreign currency or stock with a profit motive for purposes of § 165(c)(2).

7. It is determined that, even if the foreign currency option(s) are treated as having been contributed to Evergreen Trading, LLC, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call option(s) to the same counter-party. Thus, the basis of the contributed option(s) is reduced, both in the hands of the contributing partners and Evergreen Trading, LLC. Consequently, any corresponding claimed increases in the outside basis in Evergreen Trading, LLC resulting from the contributions of the foreign currency option(s) are disallowed.

8. It is determined that the adjusted bases of the long call positions (purchased call options), zero coupon notes, and other contributions purportedly contributed by the partners to Evergreen Trading, LLC has not been established under I.R.C. § 723. It is consequently determined that the partners of Evergreen Trading, LLC have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).

9. It is further determined that, in the case of a sale, exchange, or liquidation of Evergreen Trading, LLC partners' partnership interests, neither the purported partnership nor its purported partners have established that the bases of the partners' partnership interests were greater than zero for purposes of determining gain or loss to such partners from the sale, exchange, or liquidation of such partnership interest.

10. Accuracy-Related Penalties

It is determined that the adjustments of partnership items of Evergreen Trading, LLC are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there was no showing of reasonable belief by the partnership or its partners that the position taken was more likely than not the correct treatment of the tax shelter and related transactions. In addition, all of the underpayments of tax resulting from those adjustments of partnership items are attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross valuation misstatement(s), or (3) negligence or disregarded rules or regulations. There has not been a showing by the partnership or any of its partners that there was reasonable cause for any of the resulting underpayments, that the partnership or any of its partners acted in good faith, or that any other exceptions to the penalty apply. It is therefore determined that, at a minimum, the accuracy-related penalty under Section 6662(a) of the Internal Revenue Code applies to all underpayments of tax attributable to adjustments of partnership items of Evergreen Trading, LLC. The penalty shall be imposed on the components of underpayment as follows:

A. a 40 percent penalty shall be imposed on the portion of any underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e), and 6662(h) of the Internal Revenue Code.
B. a 20 percent penalty shall be imposed on the portion of the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.
C. a 20 percent penalty shall be imposed on the underpayment attributable to the substantial understatement of income tax as provided by sections 6662(a), 6662(b)(2), and 6662(d) of the Internal Revenue Code.
D. a 20 percent penalty shall be imposed on the underpayment attributable to the substantial valuation misstatement as provided by Sections 6662(a), 6662(b)(3), and 6662(e) of the Internal Revenue Code.

It should not be inferred by the determination of the Accuracy Related Penalty in this notice that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought under IRC § 7201, 7206 or other provisions of federal law if determined to be appropriate.